**Christian Julian Perez <cjp@gs2law.com>**

## Discovery Matters, Weather Brands et al. v. BMC et al.

**Matthew McFarlane** <matthew.mcfarlane@practus.com> Fri, Sep 11, 2026 at 6:51 PM
To: Pranav Katti <pk@gs2law.com>
Cc: Michael Steinmetz <ms@gs2law.com>, Christian Julian Perez <cjp@gs2law.com>, Gabriella Fernandez <gf@gs2law.com>, Andrea Timpone <at@gs2law.com>, Chris Colvin <chris.colvin@practus.com>, "Jeffrey A. Lindenbaum" <jeffrey.lindenbaum@practus.com>

Dear Pranav,

Your September 9 email demanded that ASP respond to Parts I and II by September 10 because ASP had previously stated that it expected to begin producing documents from its expanded collection on September 11. That deadline was unilateral and unreasonable, and ASP did not accept it. ASP’s work continues on the collection, processing, review, and production that Defendants already demanded, rather than interrupting that work to respond on Defendants' timetable to yet another set of proposed searches and discovery exercises. ASP intends to continue that substantial work to produce documents as quickly as possible.

There is a more fundamental problem with Defendants’ approach to discovery that needs to be addressed immediately. If Defendants' objective is to maximize the volume of material ASP must collect, process, search, review, and analyze, then the approach reflected in your correspondence has been quite effective. If the objective is to obtain information within the scope of Rules 26 and 34, however, Defendants have still not identified what ***responsive information*** is supposedly missing or explained why the increasingly burdensome exercises they demand are necessary to obtain it.

Rule 26 does not authorize discovery simply because information exists. Rule 26 certainly does not command ASP to produce vast quantities of information because Defendants would like to know what ASP has. Such fishing expeditions are not sanctioned by the Rules. Discovery must concern nonprivileged information ***relevant to a claim or defense*** and must be ***proportional to the needs of the case***. The party seeking discovery bears the initial burden of demonstrating relevance and proportionality. *Winfield v. City of New York*, No. 15-CV-5236 (LTS) (KHP), 2018 WL 840085, at *3 (S.D.N.Y. Feb. 12, 2018). Even where additional discovery is relevant, an expansive re-search based on a factually thin showing that it might yield additional meaningful documents can amount to the sort of "scorched-earth approach to discovery" that Rules 1 and 26 do not permit. *GMO Gamecenter USA, Inc. v. Whinstone US, Corp.*, No. 22-CV-5974 (JPC) (KHP), 2025 WL 722853, at *1 (S.D.N.Y. Mar. 5, 2025).

Rule 34 likewise requires the requesting party to identify the documents or categories sought with reasonable particularity. Courts in this District have expressly recognized that the requesting party has an obligation to tailor its document requests to relevant information that is proportional to the needs of the case. *Optionality Consulting Pte. Ltd. v. Edge Technology Group LLC*, No. 18-CV-5393 (ALC) (KHP), 2022 WL 1977746, at *3-4 (S.D.N.Y. June 3, 2022). Rule 26(g) separately requires counsel to certify that discovery demands are consistent with Rule 26, not interposed for an improper purpose, and neither unreasonable nor unduly burdensome.

Those principles matter here because Defendants increasingly treat search terms, custodians, mailboxes, mobile devices, native-file manipulation, and search statistics as if they were independent forms of discovery. They are not. They are potential methods for locating information ***responsive to actual discovery requests***. A keyword is not a request for production. A custodian is not a request for production. A mailbox is not a request for production. A warehouse report is not discoverable simply because ASP possesses it. And the fact that Defendants do not know everything contained in ASP's files does not require ASP to conduct an open-ended investigation of its own business records so that Defendants can find out.

The Southern District has specifically cautioned against this sort of inquiry when it becomes "discovery on discovery." Before collateral inquiry into a producing party's systems and discovery processes is warranted, the requesting party must provide an adequate factual basis for it, and the court must guard against extending an already expensive discovery process *ad infinitum*. *Winfield*, 2018 WL 840085, at *3.

Against that background, ASP responds to the individual demands in your September 9 email as follows.

**I. Search Terms.** ASP has already substantially expanded its collection at Defendants' insistence. ASP searched eighteen custodians using terms directed to the products, parties, marks, retailers, and infringement issues actually involved in this litigation. Even after ASP excluded several facially broad terms that generated overwhelmingly irrelevant material, the search returned approximately 45 GB of raw data requiring processing and review.

Your September 9 email nevertheless demands that ASP now rerun or supplement that exercise using terms ASP previously considered but did not ultimately employ, additional Category B and Category C terms, new product-name variants, and an expanded date range. You also demand per-term hit counts and explanations for how the exclusion of every proposed term affected the production. ASP will not comply with those demands.

Defendants' premise appears to be that once a possible search term has been proposed, ASP must either run it forever or prove, term by term and with data generated for Defendants, why it should not be run. That is not the standard. Search terms are a means of locating ***potentially responsive*** ESI. They necessarily require judgment about the terminology used, the volume generated, false positives, redundancy, and the relationship between the search and the documents actually requested.

The problems inherent in Defendants' approach are not novel. The Southern District has long recognized that keyword searches can be massively overinclusive and generate large numbers of irrelevant documents that then must be manually reviewed at substantial cost. *Da Silva Moore v. Publicis Groupe*, 287 F.R.D. 182, 190-92 (S.D.N.Y. 2012). The Court more recently rejected a second round of broad search terms where there was little evidence that the additional searches would locate responsive documents not already produced. *GMO Gamecenter*, 2025 WL 722853, at *1. The Court also limited proposed additional custodians and an expanded date range where the requesting party had not adequately shown the additional discovery would yield meaningful responsive information.

Most importantly, the producing party is ordinarily best situated to determine how to search its own ESI. *Hyles v. New York City*, No. 10 Civ. 3119 (AT) (AJP), 2016 WL 4077114, at *3 (S.D.N.Y. Aug. 1, 2016). *Hyles* rejected an attempt by the requesting party to dictate the producing party's search methodology and explained that the governing question is not whether another methodology might theoretically be better or more complete. The question is whether the producing party's search and resulting production are ***reasonable*** and ***proportional***. If a requesting party later demonstrates an actual deficiency, that can be addressed then. It is not a basis to require the producing party to adopt the requesting party's preferred methodology in advance. That is particularly apt here. Defendants have not even had a meaningful opportunity to review the expanded production before demanding another search.

If Defendants believe that ASP has failed to produce documents responsive to a particular request for production, Defendants should identify the request. They should identify what responsive information they believe to be missing, and critically, Defendants should explain why that information is ***relevant to a claim or defense***. And they should provide some reasonable basis to believe that an additional proposed search of ESI using keywords is likely to locate that missing information.

Defendants have not done that. Instead, Defendants continue to propose common words that demand that ASP search them, review everything returned, and produce whatever responsive information may emerge. The explanation that Defendants cannot know what additional searches might reveal because they do not know everything contained in ASP's files confirms rather than answers ASP's objection.

For the same reason, ASP will not generate per-term hit counts simply to facilitate Defendants' effort to design further searches. A raw hit count does not establish that the documents returned are relevant or responsive. As *Da Silva Moore*

illustrates, broad terms may yield enormous numbers of false positives. 287 F.R.D. at 190-91. If Defendants identify a concrete deficiency in response to a particular document request and explain why a particular search term would address that deficiency, ASP can evaluate the issue then. ASP will not generate a new body of discovery-about-discovery so Defendants can decide what else they would like ASP to search.

The same applies to the additional variants BH-50, BH 50, AZ-BH-50, and R-Best. Their appearance somewhere in already-produced documents does not, by itself, establish that ASP must rerun an eighteen-custodian collection using each term. Defendants must first identify what responsive information they contend is absent from the production and why another search is necessary to locate it.

The demand to expand the date range has the same defect. Your email refers generally to descriptiveness, licensing, quality control, and registration issues and asserts that relevant conduct may predate February 2024. That does not justify requiring ASP to rerun its entire eighteen-custodian search across an additional period. If Defendants contend that a particular served request requires documents from an earlier period, identify the request, the claim or defense to which those documents relate, the information allegedly missing, and the period reasonably necessary to obtain it. ASP will not expand every search across an additional period based on the possibility that something relevant might be found.

**II. Periodic Operational Reports**. The demand concerning ASP's recurring operational reports illustrates the problem even more clearly. ASP explained that these reports concern its business as a whole, of which the ice-melt business is a very small component. The recurring reports contain commercial information concerning inventory, sales, cost, demand, customer activity, and other subjects across ASP's product portfolio. ASP nevertheless identified the principal report types and described the information contained in them so that Defendants could identify any particular ***relevant information*** actually needed to support or rebut any claim or defense at issue in the litigation. Defendants still have not done so.

Instead, Defendants now propose that ASP take every periodic report, identify all 61 ice-melt products by SKU and UPC, remove every non-ice-melt row, retain all columns, tabs, formulas, and workbook structure, and then produce the newly filtered Excel workbooks. ASP will not undertake Defendants' proposed data-processing project.

The fact that ASP can identify its ice-melt products does not mean that Rule 34 requires ASP to reconstruct hundreds of operational workbooks into a new collection designed according to Defendants' specifications. Nor have Defendants explained why they need the workbook architecture, formulas, hidden fields, tabs, or other native functionality to prove or defend any issue in this case.

The Delaware Warehouse Delivery Report is a useful example. ASP explained that it is a periodic inventory snapshot for one warehouse and contains information including the item, quantity available, pallet count, item class, and current landed cost. Defendants respond that "inventory quantities, item class, and landed cost are responsive to Defendants' requests concerning sales, inventory, and damages" and therefore demand the reports in filtered native form. That assertion skips the relevant questions.

Which request for production requires periodic snapshots of the contents of ASP's Delaware warehouse? Which claim or defense makes the historical contents of that particular warehouse relevant for a particular claim and defense at issue in the litigation? What information in those snapshots is needed? How would that information bear on damages or any other disputed issue? And, if some particular inventory or cost information is relevant, why would production of that information in a separate, usable form be inadequate? Defendants have answered none of those questions. Saying generally that a warehouse report concerns "inventory" or "damages" is not enough. Rule 26 requires relevance to a claim or defense and proportionality to the needs of the case. It does not permit discovery of every record that happens to contain a category of financial information that might conceivably have some relationship to damages. Proportionality focuses on the incremental value of the discovery sought, and even relevant information may be disproportionate when substantially equivalent information can be obtained in a less burdensome form. See *Winfield*, 2018 WL 840085, at *3.

The Open Sales Report presents the same issue in an even more revealing way. ASP explained that those reports use customers' item numbers rather than ASP's product identifiers, meaning that isolating ice-melt transactions would require mapping the reports back to individual purchase orders. Defendants' answer is that ASP should therefore produce the reports natively and allow Defendants to perform the mapping themselves. Defendants are effectively saying that because determining what information within a mixed business report is relevant would require work, ASP should simply turn over the business report and let Defendants inspect ASP's unrelated commercial information to see what they can find. That reverses Rule 26. The proper inquiry is first to identify the responsive and relevant information sought. It is not to obtain a broad universe of otherwise irrelevant business records and then investigate whether something useful may be found within it.

ASP's prior exemplars do not alter that conclusion. Those exemplars were provided as an accommodation to demonstrate the nature of the recurring reports and the types of information they contained. They were not a concession that the reports themselves were responsive and discoverable. Defendants' complaints about cell-level redactions and resolution therefore do not establish a right to wholesale native production or require ASP to recreate the exemplars according to Defendants' preferred format.

ASP therefore repeats what it has already told Defendants. Identify the particular information from the periodic reports that Defendants contend is responsive to a particular request for production and relevant to a claim or defense. If Defendants need relevant sales figures, inventory information, unit costs, quantities, or another specific category of information concerning the products at issue for a particular time period, say so and identify the request that calls for it. ASP can then evaluate whether that information has been produced and, if not, how it can reasonably be provided in a form capable of being admitted into evidence at trial. ASP will not do is produce or reconstruct its company-wide operational reporting merely because Defendants would prefer to search those records themselves.

**III. Custodians and Email Accounts**. ASP also rejects Defendants' attempt to turn the expanded custodian search into another account-by-account discovery project. Defendants previously identified additional individuals whom they believed should be searched. ASP responded by expanding the collection to eighteen custodians, including the individuals Defendants identified. ASP then ran the expanded search and began processing the resulting data for review and production. Again, the relevant question is whether ASP has conducted a reasonable search for documents responsive to Defendants' actual document requests. It is not whether Defendants can identify another address appearing somewhere in the production and require ASP to investigate and certify the history of that account before Defendants have identified a single responsive document that is missing.

The responding party is ordinarily best situated to determine how to search its own ESI, and the requesting party does not get to dictate a different methodology merely because it prefers one. *Hyles*, 2016 WL 4077114, at *3. If the completed production later demonstrates an actual deficiency, Defendants may identify that deficiency. What Defendants may not do is require ASP to continually expand and restart its collection based on speculation about what another account or address might contain.

Rule 26 requires more than speculation before imposing that burden. When discovery is directed to collateral matters concerning a producing party's discovery process, *Winfield* requires an adequate factual basis and warns against discovery extending *ad infinitum*. 2018 WL 840085, at *3. Defendants have made no such showing here.

**IV. Clawback.** The clawback issue should have ended long ago.ASP inadvertently produced a small number of unredacted communications involving ASP executives and litigation counsel. ASP identified the internal ASP personnel involved, including Joe Cohen, ASP's CEO, and Paul Riley, ASP's COO. ASP expressly asserted both attorney-client privilege and work-product protection. ASP then produced redacted versions preserving the nonprivileged portions of the documents and requested return or destruction of the inadvertently produced unredacted versions.

Defendants nevertheless continue to refuse to return or destroy the unredacted documents while accepting service of redacted copies of the same and demanding additional information concerning the privilege claim. Your September 9 email now confirms that Defendants have sequestered those materials and have not used or disclosed them but apparently reserve the right to present them to the Court under seal for determination of the privilege claim. Rule 26(b)(5)

(B) supplies the procedure. Once notified of a privilege claim, the receiving party must return, sequester, or destroy the identified information, must not use or disclose it while the claim is unresolved, and may present the information to the Court under seal for determination of the claim. Defendants have elected sequestration. If Defendants continue to offer a genuine dispute as to ASP's privilege claim, present that dispute to the Court under Rule 26(b)(5). What ASP will not do is permit Defendants to convert a routine clawback into another open-ended discovery exercise concerning communications with past litigation counsel.

Defendants' invocation of Local Civil Rule 26.2 is misplaced because Defendants' counsel is in possession of the clawed-back documents in question and can see, with their own eyes, those documents' authors, senders, recipients, dates, and the fact that the communications involve litigation counsel. ASP has identified the relevant ASP executives and their positions. ASP has identified the privileges asserted. ASP has provided redacted copies exposing the nonprivileged content. Defendants therefore know the basic facts necessary to understand the claim. If Defendants believe that ASP has failed to supply information required by Local Civil Rule 26.2 and that the omission defeats ASP's privilege claim, they can raise that issue with the Court in connection with the procedure they themselves cite under Rule 26(b)(5)(B). ASP will not answer a continuing series of questions probing privileged communications while Defendants retain the unredacted communications indefinitely.

Either challenge the privilege or do not. If Defendants challenge it, ASP will address the claim before the Court. If Defendants do not intend to challenge it, return or destroy the clawed-back documents and confirm that they have done so as required by the Rules. There is no need for another meet and confer about that issue.

**V. Text Messages and Mobile Devices**. Defendants' demands concerning text messages are another example of discovery methodology being treated as substantive discovery. ASP previously advised that responsive text messages have been produced and that additional responsive text messages will be produced if identified in the course of ASP's reasonable collection and review. Defendants now demand the identity of every custodian whose devices have been or will be collected, the basis for excluding anyone on the eighteen-mailbox list, every personal or business device and telephone number used by each custodian, whether any device was replaced, wiped, or lost, the collection method for each device, any vendor involved, the date range, the search terms, the person applying them, and the Bates ranges and collection methodology for previously produced messages. ASP will not respond to a demand for an investigation into its discovery process. If Defendants make a genuine request for text messages within the scope of identified requests, ASP will make a search for relevant text messages and produce them upon review.

Despite increasingly hyperbolic and tortuously long emails decrying endless discovery infractions and prejudice, Defendants ***still*** have not identified a single request for production for which a reasonable inquiry or production has not been made. They have not identified a single missing text-message conversation within ASP's possession. They have not identified a custodian who plainly used text messages concerning a relevant subject, but whose messages are absent. They have not identified a gap in chronology or subject matter suggesting that relevant messages were omitted. Instead, they demand a forensic accounting of ASP's mobile-device collection before reviewing the expanded production. *Winfield* requires an adequate factual basis before imposing discovery about discovery. Defendants have not supplied one.

Defendants also assert that Plaintiffs previously challenged Defendants' text-message collection and therefore ASP must employ the same methodology Defendants say Plaintiffs demanded from them. There are no geese and ganders here. Discovery obligations arise from the Rules, the requests actually served, the information reasonably available, and the facts relating to each party's preservation and collection. A discovery position concerning a different party's collection does not create a freestanding rule that every mobile device associated with every email custodian must be forensically collected and searched using whatever keyword protocol Defendants propose.

Nor are Defendants entitled to dictate the particular technological method ASP uses to locate responsive ESI. Again, *Hyles* holds that the responding party is ordinarily best situated to select a reasonable and proportional search methodology. 2016 WL 4077114, at *3. ASP will continue its reasonable collection, review, and production of responsive text messages. ASP will not provide the six-part forensic accounting demanded in your September 9 email. If, after reviewing ASP's production, Defendants identify an actual deficiency in response to a particular request, they may identify it with specificity and ASP will evaluate it.

**VI. Timing**. Finally, ASP will not commit to the internal production deadlines Defendants continue to demand. ASP previously explained that its expanded search generated a substantial quantity of material requiring processing, review for responsiveness, privilege review, quality control, and production. That work takes time. The fact that Defendants want additional time to review ASP's production does not permit Defendants to dictate how quickly ASP must complete that work, much less require ASP simultaneously to stop that review and perform the additional searches, account investigations, native-file reconstruction, mobile-device analysis, and search reporting demanded in your September 9 email.

ASP's prior statements concerning anticipated or targeted production dates were estimates concerning an ongoing review. They were not agreements to complete review by an artificial internal deadline, and ASP will not make such a commitment now. There is also no need to manufacture urgency that the Court has expressly provided the parties a mechanism to address, now that fact discovery may extend into the expert-discovery period upon the parties' consent. If additional time is reasonably needed for the completion or review of document discovery, the parties can use that mechanism. ASP will not sacrifice the accuracy and completeness of its review merely to satisfy a date imposed by Defendants.

ASP will continue making reasonable progress on its review and production. It will not identify a date by which every category will necessarily be complete, and it will not continually revise internal projections in response to demands from Defendants.

**VII. Further Meet and Confer**. ASP does not believe that any issue currently raised by Defendants is properly framed for a productive meet and confer. Before demanding another search, another custodian, another account, another date range, another data source, another native-file exercise, or another inquiry into ASP's discovery process, Defendants need to return to the discovery requests they actually served.

Identify the request for production. Identify the responsive information Defendants contend is missing. Explain how that information is relevant to a claim or defense. Explain the factual basis for believing ASP's existing search and production will not locate it. And explain why the additional burden Defendants propose is proportional to the likely value of the missing information. "We do not know what ASP has" is not an answer. No requesting party knows everything contained in the opposing party's files. If that were sufficient to compel additional searches, there would be no limiting principle and searches would be bounded only by the scheduling order. Every search could justify another search, every produced email could identify another custodian, every custodian could identify another account, and every business record could justify production of an entire database because something else might be found there. That is exactly the *ad infinitum* discovery problem the court has cautioned against. *Winfield*, 2018 WL 840085, at *3. Defendants should review ASP's production. If it reveals a concrete deficiency in response to an actual document request that's potentially responsive to a document request and relevant to the claims and defenses at issue, identify it. ASP is committed to addressing such legitimate deficiencies, but at this time, none have been presented.

Until then, ASP declines to consider the additional searches, search-term reporting, expanded date range, native-file reconstruction, additional account collection, in-house-counsel mailbox search, mobile-device investigation, and other discovery exercises demanded in your September 9 email.

Regards,

Matthew

**Matthew McFarlane**
Partner
PRACTUS
(410) 657-8633
matthew.mcfarlane@practus.com

My Bio | Connect on LinkedIn

**From:** Pranav Katti <pk@gs2law.com>
**Sent:** Wednesday, September 9, 2026 1:41 PM
**To:** Matthew McFarlane <matthew.mcfarlane@practus.com>
**Cc:** Michael Steinmetz <ms@gs2law.com>; Christian Julian Perez <cjp@gs2law.com>; Gabriella Fernandez <gf@gs2law.com>; Andrea Timpone <at@gs2law.com>; Chris Colvin <chris.colvin@practus.com>; Jeffrey A. Lindenbaum <jeffrey.lindenbaum@practus.com>
**Subject:** Re: Discovery Matters, Weather Brands et al. v. BMC et al.

Matthew,

Thank you for your detailed response. It resolves some issues and leaves others open. We address the open items below and **ask that ASP treat Parts I and II as time-sensitive if it intends to make its first production from the expanded custodian and keyword search on September 11**.

There are many outstanding discovery issues to address, and we once again wish to point out the protracted schedule. We previously informed Plaintiffs and the Court that Defendants will have to review the productions, identify deficiencies, and obtain corrected or supplemental production before the close of document discovery, and that Plaintiffs have little time to conduct their additional searches on a September 18 deadline. We are running into this precise issue now. Defendants remain willing to discuss a schedule that gives both sides adequate time. What Defendants cannot accept is a production timeline that does not allow Plaintiffs to conduct a sufficient search and forecloses review of the productions it delivers.

**I. Search Terms**

ASP's September 4 list is materially narrower than the terms ASP itself proposed on August 19, and it does not respond to the compromise Defendants offered on August 25.

***Terms ASP has withdrawn from its own proposal.*** ASP's August 19 email committed to running !licens!, !acqui!, !fire!, and the retailer strings with snow!. None of those appears in the September 4 list, and ASP's leading truncation has been dropped throughout. ASP also declines to provide per-term hit counts while representing that exclusions reduced returns by 70% and that the search yielded approximately 45 GB of data. Case law supporting the idea that hit counts are not a measure of burden or relevance is beside the point. ASP's 70% figure does nothing to prove that these results are irrelevant or an undue burden. Lumping together all excluded terms to show a 70% reduction in search volume is not an acceptable justification, **especially where ASP expressly committed to running these terms in its August 19th email.** If ASP is going to now renege on its agreement, it must provide the pertinent information on each search term, why a search for that specific term is no longer viable due to relevance or burden, and how the exclusion of each search term affects the production. Defendants have offered to revisit any term the data shows to be an outlier; ASP cannot unilaterally remove a search term it agreed to run without sufficiently showing its factual basis for doing so. ASP's own production history refutes the premise of its objection. ASP previously represented that its production was complete. Only after Defendants insisted on further searching did ASP produce approximately 44,000 additional documents. **Whatever ASP believed about the yield of broader searching, its belief was wrong by tens of thousands of documents.** ASP now asks Defendants to accept that the excluded terms would return nothing but irrelevant material, while declining to produce the per-term data that would permit that judgment to be tested. Defendants are not obliged to take ASP's estimate on faith a second time.

***Defendants' Category B proposal.*** Defendants offered to accept !Descri!, !Trademark!, !Principal!, !Transfer!, !Revenue!, !Royalt!, and !Packag! with a limiter tying each to the accused products and asserted marks. ASP's response does not mention these terms. The limiter is a direct answer to the volume objection ASP raises. Please state whether ASP will run these terms or propose an alternative connector or proximity limiter.

***Defendants' Category C proposal.*** !Pellet! and !Blue! have been reduced to fixed phrases, and !Supplement!, !Label!, !Compare!, and !Similar! were not run at all. These go to the accused product form, the mark at issue, ASP's Supplemental Register position, and likelihood of confusion. A search that excludes them is not a search of the issues in this case. As with the terms ASP withdrew from its own August 19 proposal, ASP's assumption that these terms would return nothing of value is not one Defendants can accept on faith. The 44,000 documents that surfaced only after Defendants pressed for additional searching are the measure of how reliable that assumption has proven. Please state whether ASP will run these terms or propose an alternative connector or proximity limiter.

***Variants.*** Please add BH-50, BH 50, AZ-BH-50, and R-Best. Each appears in ASP's own produced documents.

***Date range.*** Please state the basis for the February 6, 2024 start date and the May 11, 2026 end date. ASP has not identified what either date corresponds to, and the start date appears arbitrary. It also excludes the period in which much of the relevant conduct occurred. Evidence bearing on descriptiveness, including ASP's own use of the terms at issue, third-party and market use, and ASP's understanding of the scope of its rights when it sought registration on the Supplemental Register, necessarily predates February 2024. So does evidence concerning the licensing of the asserted marks and the quality control, or absence of it, exercised over any licensee. Defendants' defenses turn substantially on conduct occurring before ASP's chosen start date, and a search beginning in February 2024 cannot reach it. Please identify the basis for the start date or extend the collection period to cover the conduct at issue. The May 11, 2026 end date presents the opposite problem: it excludes nearly four months of communications, and ASP's production must in any event be supplemented through the present.

**II. Native Periodic Reports**

***Exemplar quality.*** ASP's September 4 letter does not address our request that the exemplars be reproduced. The redactions bleed across cell boundaries and obscure adjacent data ASP has not identified as unrelated to ice melt, and the resolution renders the files substantially illegible. Please reproduce them with redactions applied at the cell level and at a legible resolution.

***Rule 1006.*** ASP proposes to offer summaries under Rule 1006 with a Rule 901 and 803(6) certification while withholding the underlying files. Rule 1006 requires the proponent to make the originals or duplicates available for examination or copying. ASP cannot rely on the rule and withhold the materials the rule requires it to produce. **Your reliance on *Aguilar* is misplaced, there is no requirement of a showing that a report was altered, and *Aguilar* supports the production of the native files.** *Aguilar v. Immigration & Customs Enf't Div.*, 255 F.R.D. 350, 354-55 (S.D.N.Y. 2008) ("Examples [of embedded metadata] include spreadsheet formulas . . . references and fields, and database information. This type of metadata is often crucial to understanding an electronic document. For instance, a complicated spreadsheet may be difficult to comprehend without the ability to view the formulas underlying the output in each cell. For this reason, the District of Maryland working group concluded that **embedded metadata is "generally discoverable" and "should be produced as a matter of course**.").

***Defendants' specific request.*** ASP has asked Defendants to identify the information they need. Without waiving the request for the native files, Defendants propose the following. ASP represents that 61 of its products relate to ice melt. **If ASP knows the precise number of ice melt products, it should be able to identify those 61 items by SKU and UPC, and produce each periodic report in native Excel format filtered to those items, with columns, tabs, formulas, and workbook structure preserved and non-ice-melt rows removed.** That approach withholds the commercial data ASP describes as sensitive and the entire reason for withholding the native files, preserves the structure necessary to test completeness, and eliminates the redaction-quality problems entirely. If ASP declines, please explain what protection redacted static images provide that row-filtered natives do not.

***Delaware Warehouse Delivery Report**.* Inventory quantities, item class, and landed cost are responsive to Defendants' requests concerning sales, inventory, and damages. Please produce these reports on the same filtered basis.

***Open Sales Report.*** ASP states these reports key to the customer's item number rather than ASP's product identifiers, so isolating ice-melt lines would require rebuilding from purchase orders. That is a reason to produce the reports in native form and permit Defendants to perform the mapping, not a reason to withhold them.

**III. Custodian Searches**

Defendants appreciate ASP's expansion of the custodian list. Three items from our August 25 letter remain unresolved.

1. **zchen@truvoltbrands.com** does not appear on ASP's list of searched mailboxes and is not addressed in ASP's explanation of the no-hit accounts. Please confirm whether this mailbox exists and whether it has been searched.
2. **Riley and Wagner.** ASP states the search covers each custodian's associated addresses, but lists Paul Riley and Donna Wagner at truvoltbrands.com only, while listing multiple addresses for Joe Cohen and Natalie Lamb. Defendants identified separate allseasonpower.com addresses for both Riley and Wagner in the production. Please confirm those mailboxes were collected.
3. **bg@fescony.com.** ASP lists Benjy Goldstein at bgoldstein@truvoltbrands.com. Please confirm whether the fescony.com account was separately collected and searched.

ASP's explanation of the no-hit accounts states that “two of those individuals joined ASP shortly before ASP intervened,” then refers to a single mailbox. Please identify which individuals, their start dates, and whether their mailboxes were searched in the expanded collection.

***Anthony Ruiz.*** ASP has excluded its in-house counsel's mailbox from collection on the assumption that "most, if not all" of its contents are privileged. **Privilege is asserted document by document and logged; it is not a basis for declining to search.** Mr. Ruiz's non-privileged business communications concerning clearance, licensing, and enforcement bear directly on Defendants' defenses. Privilege is logged, not assumed. Please collect and search the account and log anything withheld.

***Prior productions.*** ASP's first four productions were run against ten custodians. Please confirm that the expanded search covers the full date range for all eighteen custodians, so that the earlier productions are superseded rather than supplemented piecemeal.

**IV. Clawback**

ASP identifies Joe Cohen and Paul Riley as the ASP personnel on the clawed-back communications, while adding that the corporate privilege is not confined to a control group. That phrasing suggests there are participants ASP has not named. Under Rule 26(b)(5)(A) and Local Civil Rule 26.2(c)(2)(A)(iv), ASP must identify the author, the addressees, and any other recipients of each document, together with the relationship among them where not apparent. Please provide that information for each document at issue, including every sender and recipient, each person's role and employer, and confirmation whether any participant is outside ASP and its counsel.

It is ASP’s burden to establish every element of the privilege, and that burden “cannot be discharged by mere conclusory or ipse dixit assertions.” *Bowne of N.Y.C., Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y. 1993); *see also Universal Standard Inc. v. Target Cor*p., 331 F.R.D. 80, 86 (S.D.N.Y. 2019) (proponent must establish both that the privilege applies and that it has not been waived).

ASP has twice characterized Defendants' requests for the basis of its privilege assertions as a “refusal to comply” with the rules governing inadvertent production. **That is a backwards reading of the rules. Asking who was on the communications and in what capacity is precisely what Rule 26(b)(5) and Local Rule 26.2 entitle Defendants to ask, and ASP's obligation to answer does not diminish because it finds the question inconvenient.**

Defendants have sequestered the materials and have not used or disclosed them. We note, however, that ASP is understating Rule 26(b)(5)(B), which expressly permits a receiving party to present sequestered information to the Court under seal for a determination of the claim, and Defendants reserve that right pending ASP's response. ASP is likewise obligated under this rule to preserve the materials until the claim is resolved.

**V. Text Messages**

ASP's answer on text messages is not acceptable, and it cannot be reconciled with the position Plaintiffs have taken throughout this litigation.

ASP states only that some text messages have been produced, that it "anticipates producing additional text messages if responsive messages are found from relevant custodians," and that "text messages will not be searched with any of those keywords." That is not a collection protocol. It identifies no custodians, no devices, no collection method, no date range, and no criteria for determining responsiveness. The breadth of Defendants' proposed email terms is a reason to negotiate a narrower term set for mobile data, not a reason to abandon keyword searching entirely.

In July, Plaintiffs moved for sanctions against Defendants based on the adequacy of Defendants' text message collection, including the absence of keyword searching. ASP now proposes to do for itself precisely what Plaintiffs said Defendants could not do. Whatever ASP's view of Defendants' email terms, keyword searching of mobile data is a standard Plaintiffs themselves established in this case, and ASP is bound by it. **Defendants ask nothing of ASP that Plaintiffs did not demand of Defendants.**

Defendants will not accept a collection with no methodology at all, particularly from a party that moved for sanctions on that exact ground. ASP must provide the following:

1. The identity of each custodian whose mobile devices have been or will be collected, and the basis for excluding any custodian on the eighteen-mailbox list.
2. For each such custodian, every device and number used for business during the relevant period, including personal devices, and whether any device has been replaced, wiped, or lost since the duty to preserve attached.
3. The method of collection for each device (forensic image, targeted extraction, or custodian self-collection) and any vendor involved.
4. The date range applied.
5. The search terms ASP will apply to mobile data, and who is applying them.
6. The Bates ranges of the text messages ASP has already produced, and the method by which those messages were collected.

**VI. Timeline**

Please confirm whether ASP's production will be substantially complete as of September 18 and identify the categories that will remain outstanding as of that date.

We are available to meet and confer on any of the foregoing. Given the September 11 and September 18 dates, we ask that ASP respond on Parts I and II by September 10. Defendants reserve the right to seek relief from the Court if these issues are not resolved.

Sincerely,

Pranav

On Fri, Sep 4, 2026 at 7:08 PM Matthew McFarlane <matthew.mcfarlane@practus.com> wrote:

> Dear Pranav,

This is a response to your wide-ranging August 25 email addressing several discovery matters, primarily the redacted native periodic reports, ASP's search terms, and ASP's custodian search. If an item or issue has been missed, please follow up.

Regarding timing, ASP's collection and review from its expanded custodian and keyword search (see below) are underway, and ASP expects to make its first production from that search by Friday, September 11, 2026. ASP's goal is to have that review and production substantially complete by September 18, but, as explained to you and Michael in the meet and confer, if additional time is needed, the court has freed us to consent to extensions of time to complete fact discovery.

**I. Native Periodic Reports**

ASP's position on the native periodic reports has not changed. ASP will not produce them. These are recurring operational reports overwhelmingly devoted to business lines that have nothing to do with ice melt. Defendants' own review confirms that 953 of the roughly 1,085 instances at issue are recurring operational reports. The governing standard is relevance and proportionality, not the possibility that a responsive figure is buried somewhere in a report. Discovery must be both relevant and proportional to the needs of the case. Defendants have also not identified any relevant metadata that would justify native production for the periodic reports under consideration. Defendants' desire to inspect any formulas, pivot tables, and creation dates in the native excel files are not relevant absent some showing that a report was altered. *See Aguilar v. Immigr. & Customs Enf't Div. of U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350, 363, 364 (S.D.N.Y. 2008).

ASP will not catalog and classify hundreds of files to build a universe of report types for Defendants. Instead, ASP has identified archetype reports and the information each contains, based on the reports and the redacted examples produced at ASP004727, ASP004729, ASP004731, and ASP004733. These are not represented to be the only report types but were meant to offer Defendants a picture of what information may be contained therein. For example, the following reports appear with regularity in the documents returned from the search and have been withheld:

- **Delaware Warehouse Delivery Report ("DEL1")** — a periodic inventory snapshot at ASP's Delaware warehouse that offers the following information: item, total available, total pallet count, item class, and current landed cost. ASP did not prepare a redacted example, as these inventory snapshots are not responsive to any of Defendants' requests. If Defendants can identify a request that calls for them, ASP will consider whether they can be produced.
- **Open Sales Report** — open sales orders across ASP's customers, with order-level financial and shipping detail, including the following information: Customer Number, Sales Person, Sop Number, Batch Number, Doc Date, Customer, PONumber, Sub Total, Freight Charged, Trade Discount, Document, Amount, Currency, Requested Ship Date, Must Arrive By Date, Ship To Name, Address Line1, Address Line2, City, State, Country, Zip Code. No redacted example was prepared because these reports are keyed to the customer's own item number rather than ASP's product identifiers, so isolating ice-melt lines would require rebuilding the data from individual purchase orders.
- **Product Demand Report** (redacted example produced as ASP004733) — customer-level ordering activity including the following information: Customer ID, Item, Item Description, Class Code, Units Ordered, Units Cancelled, Unit Shipped, $, Units Shipped, DI.
- **Slow Movement Report** (redacted example produced as ASP004729) — slow-moving/excess-inventory analysis by SKU, reporting the following information for products: Item Number, Item Description, UPC, Class Code, Inv On Hand Qty, Open Orders Qty, Sales Last Year Qty, Lift Qty, Unit Cost, Inv OH Cost, Excess Qty, Landed Cost, Slow Reserve, Slow Reserve, ELCSlow Reserve, Management Comments, Last Sale Date, Item Create Date, Last Date Received, First Date Received, first Transfered Date, First Adjustment Date, Valid Date, Transfered QTY, Adjustment QTY, total QTYAdjusted, ELC, Discontinued.
- **Products and slow-mover products variants with LDP** (redacted examples produced as ASP004727, ASP004731) – contain the same basic information as the slow movement report, except with the landed duty paid.

Each class of report spans ASP's entire product portfolio. ASP sells more than 1,950 unique products, only 61 of which are confirmed to relate to ice melt at all, and only a fraction of those involves the disputed brands at issue in this

litigation. In other words, most of the periodic reports under consideration are irrelevant. Producing those reports natively would transmit sensitive commercial data relating to more than 97% percent of ASP's products.

With the report types and data columns now identified, Defendants have what they need to make a specific request for the information contained within those withheld native files and no longer any basis to claim Defendants "do not know what is there." This is not a fishing expedition. ASP will not enable one by producing its entire operational reporting so Defendants can search it to determine what it might ask for. *See Kairam v. W. Side GI, LLC*, No. 1:18-cv-1005, 2023 WL 3220159 (S.D.N.Y. Feb. 24, 2023). ASP has consistently offered to Defendants to identify the specific information needed to disprove ASP's trademark and trade-dress claims, to support any of its defenses, or identify information relevant for damages. Defendants continue to refuse this offer to obtain information about relevant ice-melt products in a usable form. ASP can provide better information in a far more meaningful form than these mixed operational reports reporting information about ASP's entire business. Consistent with the framework the parties discussed on August 13, ASP will prepare summaries or compilations of the relevant ice-melt data admissible under Federal Rule of Evidence 1006, provide them with a certification establishing authenticity and a business-records foundation under Rules 901 and 803(6), and not contest their admission under Rule 1006. But the ball is in Defendants' court to specify the information they need.

**II. Search Terms**

ASP has finalized and run the following search terms against the custodians identified below in Part III, over the period February 6, 2024 through May 11, 2026:

1. confus* OR infring* OR dart
2. (lowe* OR "tractor supply" OR "Home Depot" OR woot*) AND (melt* OR heat* OR fire*)
3. "Blue Heat" OR "Pellets of Fire" OR "Blue Fire" OR "Flakes of Fire" OR flakes* OR Wachsler OR "Blue Mineral" OR BMC OR BH50 OR BH20 OR Nightmare OR "Keep it Green" OR "Green Melt"

ASP did not run several terms Defendants proposed because they return volumes of irrelevant material that cannot realistically be reviewed for relevance or production. "Trademark*," "licens*," and "acqui*" are common terms that generate large numbers of random, non-substantive hits. ASP did not run "fire" as a standalone term because the marks at issue are BLUE FIRE and FLAKES OF FIRE, which ASP has ran and will supplement. ASP did not run "snow" as a standalone term because ASP sells dozens of snow-related products (e.g., snow blowers) that have nothing to do with the ice-melt business. Excluding those terms reduced the universe of returns by about 70%, and even so the search returned approximately 45 GB of raw data, which is now being processed for review. ASP declines Defendants' invitation to provide a hit count, because it is clear the number of hits is not a measure of relevance or burden. *See Kairam*, 2023 WL 3220159, at *2 n.4. The bottom line is that Defendants' broad search terms already sweep in a tremendous amount of overwhelmingly irrelevant material that ASP will attempt to exclude, but this scorched-earth approach to discovery is not sanctioned by the Rules. *GMO Gamecenter USA, Inc. v. Whinstone US, Corp.*, No. 22-CV-5974, 2025 WL 722853, at *1 (S.D.N.Y. Mar. 5, 2025).

**III. Custodian Searches**

In direct response to the accounts and individuals Defendants identified, ASP expanded its custodian list and ran the search described in Part II this week. It is being processed for review and production now. The search covers the following mailboxes, including each custodian's associated addresses:

| | |
|---|---|
| Paul Riley | priley@truvoltbrands.com |
| Joe Cohen | jcohen@allseasonpower.com; jcohen@truvoltbrands.com; jcohen@snowjoe.com |
| Kellie Jeffries | kjeffries@truvoltbrands.com |
| Donna Wagner | dwagner@truvoltbrands.com |

| | |
|---|---|
| Kevin Fortunato | kfortunato@truvoltbrands.com |
| Benjy Goldstein | bgoldstein@truvoltbrands.com |
| Natalie Lamb | nlamb@allseasonpower.com, nlamb@truvoltbrands.com |
| Rami Applbaum | rapplbaum@allseasonpower.com |
| Kevin Hum | khum@truvoltbrands.com |
| Brett Bernstein | bbernstein@truvoltbrands.com |
| Haichuen Thoo | hthoo@truvoltbrands.com |
| Asher Glatt | aglatt@truvoltbrands.com |
| Fatima Mukhtar | fmukhtar@truvoltbrands.com |
| Ruby Saka | rsaka@truvoltbrands.com |
| Jeffrey Bloch | jbloch@truvoltbrands.com |
| Mark Bader | mbader@truvoltbrands.com |
| Jasmin Perez | jperez@truvoltbrands.com |
| David Cohen | dcohen@truvoltbrands.com |

This set includes the individuals Defendants demanded be searched, and it resolves the address questions in Defendants' letter. The "variants" Defendants observed are simply the custodians' actual addresses (*e.g.*, Kevin Fortunato at kfortunato@truvoltbrands.com), with any discrepancy being the result of typographical errors. As to the three accounts Defendants flagged as returning no hits, two of those individuals joined ASP shortly before ASP intervened in the case, so searching his mailbox in the first round did not return any documents. Anthony Ruiz (aruiz@truvoltbrands.com) is ASP's in-house counsel and was not included in this expansive search because most, if not all, of his email messages will be at least attorney work product and likely privileged. ASP is willing to meet and confer about additional searches after Defendants have had a chance to review the upcoming productions to confirm the unlikely existence of any meaningful gaps relating specifically to the document requests propounded to ASP.

**IV. Other Matters**

Defendants ask about text messages. Some have been produced already, and ASP anticipates producing additional text messages if responsive messages are found from relevant custodians. Given the breadth of the search terms provided, text messages will not be searched with any of those keywords.

Finally, let's put the clawback issue to rest. It is clear from its face that the inadvertently produced material is a communication between ASP executives and litigation counsel. The only ASP personnel on those messages are Joe Cohen (CEO) and Paul Riley (COO), both plainly within ASP's privilege, and ASP stated the basis (attorney-client and work product) when it made the request. ASP produced redacted copies of the documents revealing the non-privileged subject matter in those materials. That ASP can identify two officers within the privilege does not mean no one else is within it, as the corporate privilege is not confined to a defined "control group," and the privilege extends to employees beyond any such control group who have information counsel needs. *Upjohn Co. v. U.S.*, 449 U.S. 383, 391, 397 (1981). Therefore, under Fed. R. Civ. P. 26(b)(5)(B), Defendants must return, sequester, or destroy the material and may not use it. Your continued refusal to comply with simple and non-controversial rules concerning inadvertent production is troubling, and I assume this explanation should settle all outstanding questions. Please confirm in writing that Defendants have returned or destroyed the clawed-back unredacted files and that none have been otherwise used or disclosed.

ASP remains willing to meet and confer on any of the foregoing matters, including the specific information Defendants seek from the periodic reports.

Regards,

Matthew

**Matthew McFarlane**

Partner

PRACTUS

(410) 657-8633

matthew.mcfarlane@practus.com

My Bio | Connect on LinkedIn

---

**From:** Pranav Katti <pk@gs2law.com>
**Sent:** Thursday, September 3, 2026 4:25 PM
**To:** Matthew McFarlane <matthew.mcfarlane@practus.com>
**Cc:** Michael Steinmetz <ms@gs2law.com>; Christian Julian Perez <cjp@gs2law.com>; Gabriella Fernandez <gf@gs2law.com>; Andrea Timpone <at@gs2law.com>; Chris Colvin <chris.colvin@practus.com>; Jeffrey A. Lindenbaum <jeffrey.lindenbaum@practus.com>
**Subject:** Re: Discovery Matters, Weather Brands et al. v. BMC et al.

Matthew,

With the long weekend coming up, I wanted to check in beforehand. As I understood it, ASP does not presently have answers to the items raised in our August 25 email, and could not provide a date by which those answers would be available.

Two requests follow from that:

1. Please advise when ASP expects to respond substantively to the August 25 items. Your August 31 email said a complete response would issue when the information was available to share, but you haven't provided a timeframe or general expectation of when we can expect a response.

2. Please confirm whether ASP's document production will be substantially complete by September 18, and identify what categories of documents remain outstanding as of today. The stipulated extension sets an end date but does not answer our request for a production timeline.

We remain available to confer further at your convenience.

Sincerely,
Pranav

On Mon, Aug 31, 2026 at 12:05 PM Matthew McFarlane <matthew.mcfarlane@practus.com> wrote:

Michael,

Defendants received ASP's fifth document production on Friday. ASP will stipulate to an extension of the document production deadline until September 18, not the 30 days Defendants propose. Please confirm Defendants' stipulation to that extension. That stipulation should inform your prior request for a production timeline, as ASP's document collection, review, and production will continue through that date.

Chris, please similarly confirm on behalf of Weather Brands.

A complete response to your voluminous and somewhat confusing requests from August 25 will be forthcoming when the information is available to share, not as commanded by your unilateral arbitrary deadlines.

ASP confirms the availability of its designated witness to sit for a deposition on October 27, 2026, subject to its objections. Please serve an updated 30(b) notice.

Regards

Matthew

**Matthew McFarlane**

Partner

PRACTUS

(410) 657-8633

matthew.mcfarlane@practus.com

My Bio | Connect on LinkedIn

---

**From:** Michael Steinmetz <ms@gs2law.com>
**Sent:** Monday, August 31, 2026 11:21 AM
**To:** Matthew McFarlane <matthew.mcfarlane@practus.com>
**Cc:** Pranav Katti <pk@gs2law.com>; Christian Julian Perez <cjp@gs2law.com>; Gabriella Fernandez <gf@gs2law.com>; Andrea Timpone <at@gs2law.com>; Chris Colvin <chris.colvin@practus.com>; Jeffrey A. Lindenbaum <jeffrey.lindenbaum@practus.com>
**Subject:** Re: Discovery Matters, Weather Brands et al. v. BMC et al.

Matt - I dont think we received a reply on this - please let me know ASP's position before 2pm today.

On Fri, Aug 28, 2026 at 12:17 PM Michael Steinmetz <ms@gs2law.com> wrote:

> Hi Matt,
>
> Please confirm we can expect a complete response to the August 25 correspondance, today. Separately, please confirm your client's expected production timeline today so we can update the Court.
>
> Finally, please clearly state whether you consent to extending document discovery for another 30 days.
>
> Best,
>
> Michael
>
> On Wed, Aug 26, 2026 at 2:08 PM Matthew McFarlane <matthew.mcfarlane@practus.com> wrote:
>
>> Pranav,
>>
>> No.
>>
>> Your email, sent after business hours and less than 24 hours ago, contains at least 17 separate requests, many of which require investigation into search methodology, metadata, numerous custodians and accounts, and results for multiple search terms. Given the volume and detail of those requests, it is not reasonable to expect a response, or even an estimate of a response, so soon after our receipt of your message.
>>
>> Your email is under review with our client. We will respond in due course.
>>
>> So there is no misunderstanding, ASP is not prepared to meet and confer on any of the topics presented in your August 25 email. To be even more clear, none of the items in that email are ripe for discussion. ASP encourages counsel to focus on resolving those issues that have been properly presented as part of the agenda for the call scheduled to begin less than 30 minutes from now.
>>
>> Sincerely,
>>
>> Matthew
>>
>> **Matthew McFarlane**
>>
>> Partner

PRACTUS

(410) 657-8633

matthew.mcfarlane@practus.com

My Bio | Connect on LinkedIn

---

**From:** Pranav Katti <pk@gs2law.com>
**Sent:** Wednesday, August 26, 2026 1:55 PM
**To:** Matthew McFarlane <matthew.mcfarlane@practus.com>
**Cc:** Michael Steinmetz <ms@gs2law.com>; Christian Julian Perez <cjp@gs2law.com>; Gabriella Fernandez <gf@gs2law.com>; Andrea Timpone <at@gs2law.com>; Chris Colvin <chris.colvin@practus.com>; Jeffrey A. Lindenbaum <jeffrey.lindenbaum@practus.com>
**Subject:** Re: Discovery Matters, Weather Brands et al. v. BMC et al.

Dear Counsel,

Do you have an estimate as to when you will have an update on these items?

Sincerely,

Pranav

On Tue, Aug 25, 2026 at 7:06 PM Pranav Katti <pk@gs2law.com> wrote:

> Matthew,
>
> I write in response to your August 19 email and to address three related discovery matters: the redacted native periodic reports you made available for inspection, ASP's search terms, and ASP's custodian search.
>
> As a preliminary matter, we would like to reserve October 27, 2026 for ASP's 30(b)(6) Deposition. Please confirm.
>
> **I. Redacted Native Periodic Reports**
>
> We have reviewed the redacted exemplars posted to the Box link. 953 of the remaining 1,085 missing-native instances appear to be recurring operational reports, and the four examples show unrelated business-line content. But those examples do not support blanket withholding. The 4 redacted PDFs were selected from one narrow Bates range and one week in September 2024, three were generated at the same time, and they represent only two of seven recurring-report families.
>
> The exact sampled file types account for only 150 of the 953 reports, and the samples **do not address** 132 additional missing natives, including sales, P&L, pricing, bid, complaint-media, packaging, and product-specific records. Nor do static redacted PDFs preserve the metadata and other native information necessary to test completeness.

Any Rule 1006 summary must be verifiable against the underlying originals or duplicates and cannot replace responsive discovery.

In any case, the exemplars posted to the Box link are not usable in their current form and need to be redone and reproduced. The redactions often bleed across cell boundaries, obscuring adjacent data that ASP has not identified as unrelated to the ice-melt business, and in several instances blacking out plainly relevant information. The font is also reduced to the point of illegibility, which makes it very difficult to verify what has been withheld or to assess whether the redactions are properly limited. Please reproduce the exemplars with redactions applied cleanly at the cell level and at a legible resolution.

Before we can evaluate ASP's Rule 1006 summary proposal or narrow our request for the underlying native files, we also need the following clarified:

**1.** Are the data categories (columns, fields, and tabs) appearing in the exemplars standard categories that appear across all reports in this population, or do they vary by report, by reporting period, or by business line?

**2.** Are there categories present in the native files that do not appear in the exemplars at all, whether because they were redacted, suppressed, or simply absent from the particular files ASP selected? If so, please identify them.

**3.** How were the exemplars selected, how many reports are in the population, and over what date range do they run?

**4.** Do the reports contain formulas, pivot tables, linked worksheets, or hidden rows, columns, or tabs in native form? If so, whether that content survives in the redacted copies or the proposed summaries bears directly on whether either is an adequate substitute.

Once we have that information, Defendants can identify the specific categories for which we require complete data across the full population. We expect ASP to produce this data for all reports in the population, not a sample, and in a form that preserves its underlying structure.

To be clear, Defendants do not waive the request for the native files, and we do not accept ASP's characterization of the clawback dispute as bearing on the adequacy of Defendants' handling of confidential material. We had asked for the basis of your privilege assertions, a very reasonable inquiry in a clawback request, and we have still not received a complete answer. Once we have this information, we can respond to the clawback request appropriately.

**II. Search Terms**

ASP has agreed to run six of the twenty-eight reciprocal terms Defendants proposed on May 20, 2026, and rejects the remainder as not "reasonably narrow." We disagree, but have grouped the disputed terms below to narrow the issue.

***A. Terms Defendants withdraw.*** !Invoice!, !Registration!, and !USPTO!. ASP need not run them.

***B. Terms Defendants will accept with a limiter.*** Defendants will accept the following if run with a limiter tying each to the accused products and asserted marks — we propose AND (blue! OR "BH50" OR "BH20" OR melt! OR snow! OR heat! OR fire!):

- !Descri! (not !Descript!; the shorter truncation captures "description," "descriptive," and "descriptiveness")
- !Trademark!
- !Principal!
- !Transfer!
- !Revenue!
- !Flakes!
- !Royalt!
- !Packag!

If ASP prefers a different connector or a proximity limiter, we are open to discussing it. We are not prepared to drop these terms entirely; a limiter addresses the volume concern your email raises.

***C. Terms ASP must run as proposed.***

- !Pellet! and !Blue! — the accused product form and the mark at issue. A search of ASP's files that excludes both is not a meaningful search.
- "BH50" and "BH20" — specific product identifiers, and among the narrowest terms available. "BH20" was inadvertently omitted from our May 20 list and should be added.
- !Supplement! — goes directly to registration on the Supplemental Register and ASP's own understanding of the scope of its claimed rights.
- !Label! and !Compare! — bear on packaging, advertising, and comparative claims central to the case.
- !Similar! — relevant to likelihood of confusion and ASP's assessment of the parties' products.

We accept ASP's Boolean refinement of the retailer strings, including as applied to "Home Depot," and consider that issue resolved.

A general objection that terms would return an "unduly burdensome amount of non-relevant information" does not carry ASP's burden. If ASP maintains that any term in categories B or C is disproportionate, please provide the hit count and unique-document count for that term so the objection can be evaluated on the numbers. We will revisit any term the data shows to be a genuine outlier.

**III. Custodian Searches**

Your August 17 letter states that ASP searched ten email custodians. Our review of the produced email headers raises several questions about the accounts that were actually searched.

Of the ten addresses listed in the letter, only five appear exactly in the production. Three—zchen@truvoltbrands.com, aglatt@truvoltbrands.com, and aruiz@truvoltbrands.com—do not appear in any produced header, either exactly or through an identified variant.

Two others appear only through likely variants: kfortunate@truvoltbrands.com appears as kfortunato@truvoltbrands.com, and bgoldstein@fescony.com appears as bg@fescony.com.

The production also reflects separate allseasonpower.com addresses for Donna Wagner and Paul Riley. Please confirm whether ASP searched each individual's actual mailbox and all associated addresses, rather than only the specific address strings listed in the letter, and whether the three no-hit addresses returned no responsive documents or were not searched.

The production also identifies several individuals who appear substantially involved in the ice-melt business but were not included in ASP's custodian list. For example:

· Brett Bernstein appears in approximately 1,000+ produced emails, including communications concerning BH50 complaints, packaging, and damaged inventory.

· Ruby Saka, Rami Applbaum, Fatima Mukhtar, and Jeffrey Bloch likewise appear repeatedly in communications concerning product complaints, write-offs, margins, and inventory issues.

· Natalie Lamb and Kevin Hum also sent substantial volumes of retailer- and ice-melt-related communications. Please confirm whether ASP searched those individuals' accounts.

We also ask whether ASP searched the accounts of Mark Bader, Jasmin Perez, and David Cohen. Their produced communications concern PELLETS OF FIRE, R-Best, BH50 and AZ-BH-50 rework, ice-melt UPCs and quantities, product materials, and ice-melt orders.

**IV. Other Items**

- Is ASP planning on producing text messages?

- When does ASP anticipate finishing production?

Best,

Pranav

On Wed, Aug 19, 2026 at 5:30 PM Matthew McFarlane <matthew.mcfarlane@practus.com> wrote:

Dear Counsel:

I write to address ongoing discovery matters.

**1) Rule 30(b)(6) Deposition Dates.** Subject to the objections to your August 12, 2026 Notice, attached, ASP's designated witness to provide 30(b)(6) testimony will be available on October 20-22 and October 26-29. Please let me know if ASP would like to secure one of those dates.

**2) Defendants' Document Production.** ASP asked for a complete copy of Defendants' document production one week ago, and repeated that request on August 13. ASP continues to be unable to access a complete set of documents that Defendants had produced in the case. Please send ASP files for download and a load file for Defendants' document production to date.

**3) Redacted Native Periodic Reports for Inspection.** As discussed in our meet and confer, the search terms used to query the ten principal custodians of ice melt business-related affairs for ASP returned a significant number of periodic reports circulated by email as excel file attachments. Although I indicated these were daily, some but not all of them were daily, but all appear regularly. The issue ASP raised was that the great majority of information in those reports pertain to business lines unrelated to the ice-melt business. To demonstrate this, we prepared redacted copies of examples of spreadsheets in this category to reveal only ice melt products. ASP designates these files, available at the link below, with password to follow separately, as Attorneys' Eyes Only:

https://app.box.com/s/5gff9pxo7pffgrmj256ncd7krxdwhk0n

The redacted documents provided at the link provide information about the type of information kept in the native files. ASP maintains its objection to the production of those native files. Counsel's recent refusal to comply with a simple clawback request of a handful of inadvertently produced documents raises serious concerns in general about the capacity or willingness to safeguard files containing highly sensitive business records unrelated to the litigation. As an accommodation, and to avoid further disputes relating to this issue, ASP repeats its offer to produce, upon request, summaries of relevant information contained in such periodic native-file reports to permit admissibility under Rule 1006.

**4) Keyword Searching.** ASP maintains its objections to the broad and non-specific search terms proposed for querying its email database. ASP's first and second document productions included a list of reasonable search terms that still returned a significant number of irrelevant documents. Nevertheless, ASP will perform a search of email records with the following search terms, using the syntax you provide, despite the obvious overlap with other terms, against the same custodians identified in its earlier search:

!confus!

!licens!

!infring!

!dart!

!fire!

!acqui!

"Home Depot" AND (melt! OR snow! OR heat! OR fire!)

"Tractor Supply" AND (melt! OR snow! OR heat! OR fire!)

"Lowe!" AND (melt! OR snow! OR heat! OR fire!)

"Woot!" AND (melt! OR snow! OR heat! OR fire!)

ASP maintains its objections as to all other search terms (e.g., "!invoice!," "!similar!," "!descript!," "!trademark!") proposed because those are not reasonably narrow to avoid returning an unduly burdensome amount of non-relevant information that must be reviewed for exclusion.

Other discovery matters and issues you have raised are under investigation. I request that you all coordinate your messages seeking updates. It is both unnecessary and unprofessional to have multiple attorneys sending multiple messages each day requesting the same information. And again, unless specifically requested otherwise, all counsel should appear on all discovery correspondence in this matter.

Sincerely

Matthew

**Matthew McFarlane**

Partner

PRACTUS

(410) 657-8633

matthew.mcfarlane@practus.com

My Bio | Connect on LinkedIn

--

**Pranav L. Katti** | Associate Attorney
**Garson, Ségal, Steinmetz, Fladgate LLP**
225 Broadway, 37th Floor
New York, NY 10007

**w:** gs2law.com
**e:** pk@gs2law.com
**t:** +1 (212) 380-3623

--

**Pranav L. Katti** | Associate Attorney
**Garson, Ségal, Steinmetz, Fladgate LLP**
225 Broadway, 37th Floor
New York, NY 10007

**w:** gs2law.com
**e:** pk@gs2law.com
**t:** +1 (212) 380-3623

--

Michael M. Steinmetz Esq.
Garson, Segal, Steinmetz, Fladgate LLP
225 Broadway Fl 37
New York, NY 10007
(P) 212-380-3623
(F) 347-537-4540
gs2law.com

CONFIDENTIALITY NOTICE: This email is from a law firm and may contain confidential or privileged information. If you received this transmission in error, please delete this transmission and any attachments.

--

Michael M. Steinmetz Esq.
Garson, Segal, Steinmetz, Fladgate LLP
225 Broadway Fl 37
New York, NY 10007
(P) 212-380-3623
(F) 347-537-4540
gs2law.com

CONFIDENTIALITY NOTICE: This email is from a law firm and may contain confidential or privileged information. If you received this transmission in error, please delete this transmission and any attachments.

--

**Pranav L. Katti** | Associate Attorney
**Garson, Ségal, Steinmetz, Fladgate LLP**
225 Broadway, 37th Floor
New York, NY 10007
**w:** gs2law.com
**e:** pk@gs2law.com
**t:** +1 (212) 380-3623

--

**Pranav L. Katti** | Associate Attorney
**Garson, Ségal, Steinmetz, Fladgate LLP**
225 Broadway, 37th Floor
New York, NY 10007
**w:** gs2law.com
**e:** pk@gs2law.com
**t:** +1 (212) 380-3623